IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CLINT COMPSTON, Administrator of the
Estate of CLARK E. COMPSTON,
deceased,

                                              Plaintiff,

UNITED STATES OF AMERICA,

                                              Defendant

Civil Action No.:

## **COMPLAINT**

AND NOW, comes the Plaintiff, Clint Compston, Administrator of the Estate of Clark E. Compston, deceased, by and through his attorneys, Shenderovich, Shenderovich & Fishman, P.C., and Craig L. Fishman, Esquire, and files the following Complaint:

1.     The Plaintiff, Clint Compston, is an adult individual currently residing in Pittsburgh, Allegheny County, Pennsylvania.

2.     The Plaintiff, Clint Compston, is the son of the decedent, Clark E. Compston.

3.     On April 16, 2013, Clint Compston was appointed the Administrator of the Estate of Clark E. Compston by the Register of Wills of Beaver County, Pennsylvania at Estate No. 04 13-00378.

4.      The Plaintiff, as Administrator of the Estate of Clark E. Compston, deceased, brings this action on behalf of all persons entitled to recover damages for the wrongful death of Clark E. Compston pursuant to 42 Pa.C.S. §8301 and §8302.  Plaintiff also brings this action on behalf of the Estate of Clark E. Compston to recover Survival Act damages pursuant to 20 Pa.C.S. §3373.

5.      The names of all persons entitled by law to recover damages for the wrongful death of Clark E. Compston and the relationship to the decedent are as follows:

      a.      Clint Compston, the Plaintiff herein, who is the son of the decedent;

      b.      Chris E. Compston, who is the son of the decedent;

      c.      Scott Compston, who is the son of the decedent;

6.      During his lifetime, Clark E. Compston did not commence any action to recover damages for the injuries which caused his death, and no other action has been filed to recover damages for the wrongful death of Clark E. Compston.

7.      Defendant United States of America ("United States" or "U.S.") is the party that maintains the U.S. Department of Veterans Affairs and its divisions and subdivisions.

8.      The U.S. Department of Veterans Affairs ("VA") was established by Congress to administer the healthcare system for the Veterans of the United States of America, which includes health administration in the VA Healthcare System.

9.      The mission statement for the U.S. Department of Veterans Affairs is: "To fulfill President Lincoln's promise 'To care for him who shall have borne the battle, and for his widow, and his orphan' by serving and honoring the men and women who are America's veterans."

10.     The VA Healthcare System, through its facilities, provides a broad spectrum of medical, surgical and rehabilitative care for United States veterans.

11.     The VA Pittsburgh Healthcare System is a division of the United States Department of Veterans Affairs, which provides healthcare to Veterans through its facilities at University Drive Campus in Pittsburgh, Pennsylvania.  VA Pittsburgh Healthcare System also operates the A.J. Heinz Campus in O'Hara Township, Pennsylvania.

12.     The VA University Drive Campus in Pittsburgh, Pennsylvania (hereinafter "VA University Drive") serves as an acute care facility and has 146 operating beds distributed among medicine, surgery, neurology and critical care.  In addition, it provides a range of outpatient services and has doctor's offices where Veterans are seen on a daily basis for care for a variety of needs.

**NOTICE**

13.     On July 18, 2013, Plaintiff's counsel served the Pittsburgh VA Regional Office executed Standard Form 95 providing notice to the United States Government of the claim in this matter, Form 21-526, Form 21-4142, print-outs of pertinent medical records, a compact disc containing all medical records obtained from the VA regarding Clark Compston, a copy of his death certificate, and a copy of the Letters of

Administration granted to Clint Compston.  Receipt of those forms was not acknowledged by the Department of Veterans Affairs, and Plaintiff's counsel mailed them again September 26, 2013 to the Department of Veterans Affairs, 810 Vermont Avenue NW, Washington DC 20420; Pittsburgh VA Regional Office, 1000 Liberty Avenue, Pittsburgh, PA 15222; and Honorable Eric K. Shinseki, Secretary, Department of Veterans Affairs, 810 Vermont Avenue NW, Washington DC 20420, all via Certified Mail, Return Receipt Requested.  Additional information was enclosed including VHA Issue Briefs 646-11-114; 646-11-150; 646-11-114A; 646-11-150B; as well as pages 1-13 of documents from the United States Centers for Disease Control and Prevention ("CDC") regarding Case ID No. 3, who is Mr. Compston.

14.     The Certified Mail receipts were signed by the Pittsburgh VA Regional Office on September 30, 2013; by the Department of Veterans Affairs on October 3, 2013, and by the Office of Honorable Eric K. Shinseki, Secretary of the Department of Veterans Affairs on October 4, 2014.

15.     On October 29, 2013, the Office of Regional Counsel of the Department of Veterans Affairs (Region 4) sent a letter to Plaintiff's counsel requesting additional information.  In a letter dated November 1, 2013, Plaintiff's counsel provided additional information to Regional Counsel concerning this claim.

16.     By letter dated November 27, 2013, the Office of Regional Counsel of the Department of Veterans Affairs (Region 4) advised Plaintiff's counsel that the office did not receive a copy of Standard Form 95 until October 24, 2013.

## JURISDICTION

17.     This action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671.

18.     On July 18, 2013 and September 26, 2013, the Plaintiff submitted administrative claim Standard Form 95 to the United States Department of Veterans' Affairs.  Receipt of the claim forms was made by the VA.  After six months, the United States Department of Veterans' Affairs has not accepted or denied the claims. Accordingly, all conditions precedent to the Federal Tort Claims Act have been properly met.

19.     Venue is properly within this district under 28 U.S.C. §1402(b) as the acts complained of occurred in the Western District of Pennsylvania.

20.     The claims herein are brought against the United States of America pursuant to 28 U.S.C. §2671, *et seq*. (Federal Tort Claims Act), for money damages as compensation for personal injuries that were caused by the negligent and wrongful acts and omissions of the employees of the United States Government while acting within the scope of their offices and employment, under circumstances where the United States, if a private person, would be liable to the Plaintiffs in accordance with the laws of the Commonwealth of Pennsylvania.

## FACTS

21.     Clark E. Compston was born in 1937 and grew up in western Pennsylvania.  He joined the United States Marine Corps and served his country as a marksman.  In the 1960s he was stationed at the United States Guantanamo Bay naval base located in Cuba.

22.     Mr. Compston was honorably discharged from the United States Marine Corps and returned to western Pennsylvania where he worked as a union carpenter.

23.     Clark E. Compston was a dedicated veteran and patriot, who constantly and proudly displayed the American flag in the flower beds of his residence.  He would also raise a large American flag for holidays, including but not limited to Veterans Day, Independence Day, and Memorial Day.  He attended parades honoring U.S. veterans.

24.     Throughout his life, Clark E. Compston, as a veteran, used the VA Health Administration services to receive medical care.

25.     Clark E. Compston suffered from small cell lung cancer and received treatment at the VA Pittsburgh Health System University Drive Hospital ("VAPHS") in rooms 4W105 and 4W127 from September 28 - 29, 2011.

26.     The CDC concluded that Mr. Compston acquired Legionnaire's Disease due to exposure at VAPHS on or about September 28, 2011.

27.     Plaintiff's decedent began suffering from symptoms of Legionnaire's Disease several days after exposure.

28.     He presented to the VA Health Care System for medical treatment on October 13, 2011 with symptoms consistent with Legionnaire's Disease, including cough, malaise and respiratory failure due to Legionella pneumophila acquired from exposure at VAPHS.  Urinary antigen testing was not performed immediately even though VA personnel knew that Legionnaire's Disease was spreading through the VAPHS facility.  The VA's failure to perform the urinary antigen test immediately prevented Mr. Compston from receiving prompt treatment, thereby prolonging his pain and suffering.  "When suspicion is high that Legionella is the causative agent for

pneumonia, antibiotic therapy known to be effective against Legionella should be initiated while awaiting diagnostic test results". Department of Veterans Affairs Office of Inspector General Report No. 13-01189-267 at page 5. Antibiotic therapy was not started for Mr. Compston even though lung cancer patients are at an increase risk of contracting Legionnaire's Disease and Legionella was suspected to be the cause of his pneumonia.

29.     He was intubated on October 15, 2011 due to respiratory distress and treated in the ICU.

30.     A urinary antigen test for Legionella pneumophila was performed on October 15, 2011 and reported positive on October 17, 2011.

31.     Levoflaxin was prescribed on October 18, 2011 but he was switched to Moxiflaxin on October 23, 2011 because the VA hospital ran out of Levoflaxin, due to the epidemic which had been concealed from the public.

32.     His course was complicated by persistent fevers, respiratory distress and rapid atrial fibrillation.

33.     He was extubated on October 23, 2011.

34.     A sputum sample collected October 14, 2011 (received by the microbiology lab on October 18, 2011) was reported positive for Legionella pneumophila on November 1, 2011. Molecular association testing was not performed on this specimen for comparison with specimens from other patients affected by the Legionnaire's disease epidemic at the VAPHS and from the VAPHS water supply. The VAPHS destroyed and/or disposed of the specimen before molecular association testing could be performed. This spoliation of evidence prevents plaintiff from offering

molecular evidence of causation at trial.  Plaintiff is entitled to an adverse inference, due to the VA's spoliation of evidence, that Mr. Compston acquired Legionnaire's disease from exposure at VAPHS.

35.     Due to his bad experience with Legionnaire's Disease, he decided to decline further chemotherapy on October 27, 2011.

36.     He was transferred to the H. J. Heinz VA Palliative Care Unit on November 3, 2011.

37.     He was transferred to the University Drive ICU on November 9, 2011. The primary diagnosis was Small Cell Lung Cancer and the secondary diagnosis was Legionella Pneumonia. He remained on supplemental oxygen due to Legionella Pneumonia.  Treatment consisted of pain and comfort measures only.

38.     He died on November 14, 2011.


## LEGIONELLA

39.     In 1976, the American Legion was holding its convention in Philadelphia, Pennsylvania when an outbreak of infection caused by bacteria of the genus later named Legionella was recognized.  The outbreak sickened more than 200 people and 34 died.

40.     The epidemiological and microbiological investigation led to the isolation of the Legionella bacteria.

41.     Legionella is known to be present in a variety of circumstances; however it has a predilection for aquatic environments.  Its characteristics allow it to thrive in the

lines of water pipes, especially in large buildings, and particularly at temperatures in the range of 35-46°C (95-115°F).

42.    In humans, Legionella usually manifests itself as either a fever, or a serious and potentially fatal infection of the lungs, as seen in pneumonia.  In most, but not all cases, the Legionella infection is a result of a person aspirating or inhaling the infected water containing the Legionella bacteria.

43.    Since the recognition that the Legionella bacteria can flourish in water systems, certain environments have been noted to be particularly susceptible for the growth of Legionella bacteria, especially hospitals, and as such, healthcare authorities and the CDC monitor and report any known outbreak to contain the spread of any epidemic.

44.    Within Pennsylvania, the rates of a Legionella infection are the highest in the southwest corner of the state, and are particularly high in and around Allegheny County which includes Pittsburgh, which is also the site of a large veterans population and the VA University Drive Campus.

45.    In 1981, the Pittsburgh VA Healthcare System established a Special Pathogens and Clinical Microbiology Laboratory in Pittsburgh to support the clinical work of the VA in determining the presence of Legionella bacteria in human isolates, from VA patients and from water samples taken from VA facilities.

46.    Dr. Victor L. Yu was hired by the VA and was assigned as the Chief of Infectious Disease and the head of the Special Pathogens and Clinical Microbiology Lab.  In 1996, he was assigned to head the lab as a Special Clinical Resource in order

to expand testing and research of hospitals and public health agencies throughout the county, including non-VA entities, for the purposes of studying Legionella bacteria.

48.    Ultimately, the Special Pathogens Lab collected approximately 4,000 isolates which were studied and stored in the lab.

49.    Dr. Yu and his colleague Dr. Janet E. Stout, studied the Legionella bacteria and published various articles on the use of rapid diagnostic techniques to determine the presence of Legionella in a water system.  They also studied a copper-silver ionization water system to help eradicate Legionella from the water distribution systems in hospitals.

50.    In January, 1997, the Allegheny County (Pennsylvania) Health Department, in response to the Legionella outbreaks in Hospital settings and based on the research that was being conducted by the Special Pathogens Lab, published a directive for identifying, treating and controlling Legionella in Allegheny County Health Care Facilities, of which the Pittsburgh VA Hospital was included.

51.    The directive added that the Task Force which studied the issue recognized the arbitrariness of the 30% figure, but noted that even if the percentage of positive cultures was less than 30%, that the definition of the problem be located.

52.    The directive also noted that even if less than 30% testing was positive, prospective surveillance must be conducted, and testing for patients with nosocomial pneumonia to be tested for Legionella, as well as ensuring that infection control practitioners work with the patient's physician to ensure that testing and monitoring continue.

53.     Early in the decade of the 2000's it appeared promising that the copper-silver ionization units would work well to eradicate Legionella, or at least would prohibit the proliferation of Legionella in a water system, if the water system was properly and knowledgeably maintained.

54.     However, in 2006, the Pittsburgh Veterans Affairs Department decided to close the Special Pathogens and Clinical Microbiology Laboratory, and dispose of the Legionella samples that were maintained in the laboratory.

55.     The Pittsburgh Veterans Affairs Department decided that its own maintenance personnel would be able to maintain, test and address the copper-silver ionization and water treatment system at the VA University Drive Campus, as well as control the risk of Legionella disease in the water system.

56.     By August of 2006, officials at the Pittsburgh VA decided that, while they had advanced the knowledge of Legionella, a change in direction was warranted and that the field of infection control should be more directed to the eradication of MRSA (Methicillin-Resistant Staphylococcus Aureus).

57.     Unfortunately, due to the change in focus and the VA Department's lack of understanding of the water system and the importance of maintaining the same, the copper-silver ion levels in the water treatment system at the VA University Drive Hospital were not properly controlled and were rarely maintained in the effective range to control Legionella.  More importantly, the treatment levels were frequently much higher or lower than the effective range, allowing Legionella to grow and fester in the VA University Drive water systems.

## LEGIONELLA AT THE PITTSBURGH VA

58.     While understanding that Legionella was still a concern for the hospital, the Pittsburgh VA continued to monitor its systems for Legionella bacteria.

59.     On September 21, 2007, the VA Pittsburgh Healthcare System tested samples, and specifically, in the 3A Intensive Care Unit, found that 17 out of 19 samples were positive for Legionella.

60.     This finding was followed-up nine months later in June of 2008 when 3 positive tests out of 8 samples in the same intensive care unit tested positive for Legionella.

61.     On June 30, 2010, 4 out of 9 samples in the 3A Intensive Care Unit tested positive for Legionella.

62.     In the following months of July 2010, 6 out of 16 samples tested positive for Legionella.

63.     Upon information and belief, on September 8, 2011, 13 out of 22 samples in Unit 6W, 5E, 5W, 4W, 4E and 3A tested positive for Legionella.  Clark E. Compston was exposed to Legionella while on Unit 4W at VAPHS from September 28 - 29, 2011, and contracted Legionnaire's Disease due to that exposure.

64.     On October 20, 2011, 1 out of 3 samples from the 8W Unit tested positive.

65.     Finally, on November 4, 2011, 3 out of 6 samples in the 3W Unit tested positive for Legionella.

## VA LEGIONELLA POLICIES

66.     In 2008, the Department of Veterans Affairs published VHA Directive
2008-010 establishing guidelines for the evaluation of Legionella risk at the Veterans
Hospitals, which was similar to the Allegheny County directive of January 1997.

67.     As part of its policy, the Veterans Health Administration Directive noted
that Veterans Hospitals were to test water sites at least annually, and that remedial
action for Legionella positive environmental samples occurs if "the percentage of
positive distal sites is above a 'threshold level' determined by the facility".

68.     The Veterans Health Administration then went on to say that it is
recommended that a threshold level of positive distal sites be set at 30%.

69.     The directive continued on that if there is any association of Legionella
bacteria above the threshold that an action plan must be introduced to, among other
things, routinely test all patients at the facility with pneumonia for Legionnaire's Disease.

70.     Further, the policy noted that if environmental samples are positive for
Legionella pneumophila serogroup 1, then all patients at the facility with pneumonia are
to be tested by urinary antigen test.

71.     Also, the directive noted that any laboratory confirmed positive results for
Legionella disease need to be assessed for epidemiological linkage to the facility
(including molecular association testing).

72.     In addition, in 2009, the Department of Veterans Affairs Veterans Health
Administration issued a directive on domestic hot water temperature limits for Legionella
prevention and scald control.  The directive was issued to provide a policy for
establishing domestic hot water temperature to prevent Legionnaire's Disease.

73.     Although Legionella had been detected in the water supply at the VA University Drive Hospital, directives on using hot water to eradicate Legionella from the water supply at the VA were not properly implemented in that Legionella continued to fester in the water system for years.

74.     In the summer of 2011, it became a known fact to officials at the Pittsburgh VA that Legionella was present in the VA University Drive Hospital water system, and several patients began to get sick and die from the Legionella bacteria.

75.     Rather than reporting the presence of Legionella to the appropriate health officials, the officials at the VA Pittsburgh and VA University Drive Hospital attempted to control the outbreak on their own.  Clark E. Compston was exposed to Legionella while on Unit 4W at VAPHS from September 28 - 29, 2011, and contracted Legionnaire's Disease due to the VA's negligence, including its negligent effort to control the control the risk of Legionella disease in the water system and control the outbreak as heretofore and hereinafter described.

76.     By December 2011, the Pittsburgh VA realized that it could not control the outbreak on its own, and the Pittsburgh VA called in outside consultants, specifically a company called Liquitech Environmental Systems (hereinafter "Liquitech").

77.     Liquitech conducted an examination of the VA University Drive's water supply and found that the water system was not being properly maintained, and that Legionella was present in the VA University Hospital water system.

78.     The employees of Liquitech also noted that the maintenance officials and employees at the VA University Drive Hospital did not know how to properly maintain the

water systems to eradicate Legionella, and further they were falsifying test results to make it appear that the conditions were not as bad as they truly were.

79.     In the spring of 2012, employees of Liquitech reported to their supervisors, who in turn reported to the Pittsburgh VA, that the employees of the VA University Drive Hospital were not properly maintaining the water system, and were not taking the necessary and essential steps to prevent a Legionella outbreak in the water system at the hospital.

80.     Over the ensuing months of early 2012, Liquitech performed two (2) separate audits of the VA's water system, and again informed the VA of the deficiencies in the water system.

81.     Liquitech also reported that the plumbers, pipe-fitters and the supervisors who worked on the water system at the VA University Drive Hospital facilities were not properly trained, and did not know how to properly check, clean or adjust the copper-silver ionization treatment system.

82.     Liquitech's warnings went unheeded.


**LEGIONELLA OUTBREAK**

83.     On September 13, 2011, the Chief of Staff of the VA University Drive Hospital, Ali. F. Sonel, M.D., sent a memorandum to the medical staff notifying them that Legionella had been detected in the VA University Drive hot water supply.  VHA Issue Brief 646-11-150A dated September 15, 2011 indicated that this was likely due to improper maintenance of the copper-silver ionization treatment system.

84.    This memo was transmitted 15 days before Mr. Compston contracted Legionella at the VAPHS.

85.    Dr. Sonel, as a precautionary measure, recommended the use of bottled water in areas where patients would be at a high risk of infection.

86.    Because remediation procedures were going to be implemented, Dr. Sonel asked that a Legionella urinary antigen for all patients with hospital-acquired pneumonia and a Legionella culture for those that were producing sputum be obtained.

87.    In spite of Dr. Sonel's memo, in the three (3) months following the memo, only seven (7) of the seventeen (17) patients in the hospital with suspected hospital-acquired pneumonia were tested for Legionnaire's Disease, allowing ten (10) cases to be underreported.  As previously noted, Mr. Compston suffered a 2 day delay before VAPHS ordered urinary antigen testing, and VAPHS delayed 2 weeks before reporting his sputum sample test result.

88.    In 2012, following this, when officials at the Pittsburgh VA knew that there was Legionella in its water system, they did not take any extra precautions for the patients at the VA University Drive Hospital.  For example, if a patient tested positive for Legionnaire's Disease, the infection control staff at the VA University Drive checked for Legionella only in the water in the room were the patient stayed, which is contrary to infectious disease control protocols, as well as the VA's own protocols on Legionnaire's Disease.

89.    Further, when a patient tested positive for Legionella, only urine was tested.  Sputum or mucus was not consistently obtained from the patient which

prevented the hospital from having a sample to compare in order to determine whether or not the Legionella outbreak was from its facility.

90.     Also, in violation of Federal Centers for Disease Control and Prevention guidelines, the Pittsburgh VA staff did not regularly obtain patient sputum or environmental samples for comparison, even after a second "probable" case showed up at the VA University Drive Hospital, again delaying any investigation before it became a full-blown outbreak.

91.     Further, urine antigen tests, the test that the Pittsburgh VA used to determine if a patient had Legionnaire's Disease, were delayed for several days by the VA University Drive Hospital lab staff for "efficiency" reasons; they wanted to wait for a batch of five or more samples to accumulate before testing was performed.

92.     Finally, a request was made of Pittsburgh VA officials by the Chief of Infectious Disease Control at the VA University Drive Hospital to get more testing when the Legionella outbreak began; however, the testing was turned down.

## CDC

93.     It was not until the summer of 2012 that the Pittsburgh VA officially acknowledged increasing incidents of Legionella bacteria and pneumonia-related disease in its Veteran patient population.  Although it was known that Legionella was present at the VA University Drive Hospital, no authorities were contacted.

94.     Yet several more months passed, when an outside agency, the Pennsylvania Bureau of Laboratories, contacted the Centers for Disease Control (CDC) Legionella Laboratory on October 5, 2012, to request sub-typing of Legionella isolates that were found at the VA Pittsburgh Healthcare System.

95.     On October 29, 2012, the CDC reported that preliminary results indicated a link between two (2) cases of Legionnaire's Disease, with the onset of illness as August 25 and August 27, 2012, in the environmental Legionella isolate collected from the VA Pittsburgh University Drive Campus.

96.     The CDC then notified the PA Department of Health, who in turn notified the Allegheny County Health Department to investigate.

97.     On November 2, 2012, the PA Department of Health requested an Epidemic Assistance Investigation (Epi-Aid).

98.     An Epi-Aid investigation was established by the CDC to provide rapid assistance to state and federal agencies, as well as international organizations and ministries of health, with the goal of controlling an epidemic and preventing future epidemics attributable to the same or related cause.

99.     On November 5, 2012, a conference all was held with the CDC, VA Pittsburgh Healthcare System, and others, and in which the CDC informed everyone on the conference call about the results of the clinical testing.

100.    Upon learning of the results from the CDC investigation, the Director of the VA Pittsburgh Healthcare System requested a visit from the CDC.

101.    On November 6, 2012, the CDC sent two (2) Epidemic Intelligence Services officers and one (1) microbiologist to Pittsburgh where they joined the Allegheny County Health Department and the Pennsylvania Department of Health in the investigation of the Pittsburgh VA Hospitals.

102.    On November 7, 2012, the investigation began when Epidemic Intelligence Services officers visited the Oakland Campus to identify local cases of Legionnaire's

Disease among patients at the VA University Drive Hospital, complete an environmental assessment of Legionnaire's Disease risks, take environmental sampling at the hospital and recommend interventions.

103.    On November 7, 2012, the Epi-Aid team arrived to inspect healthcare facilities, including the VA University Drive Hospital, to determine possible sources of aerosolized water, which included patient care areas, waiting areas, decorative fountains and cooling towers.  In addition the Epi-Aid team inspected potable water systems, visually inspected the instantaneous hot water heaters and distribution systems, and the three copper-silver ionization flow cells and controllers.

104.    The Epi-Aid team also spoke with the staff concerning maintenance, and reviewed maintenance logs, a consultant report (presumably from Liquitech), and the Legionella specific culture results.

105.    Twenty-nine (29) of the forty-four (44) environmental samples collected by the Epi-Aid field team in November 2012 showed growth of Legionella indicating wide-spread Legionella colonization throughout the hospital.  In addition, clinical Legionella isolates from three (3) cases were identical and matched environmental isolates collected from multiple locations in the hospital's potable water system, which strain of Legionella was the outbreak strain.

106.    The Epi-Aid team found that despite the copper-silver ionization system and intermittent superheating during the past two (2) years, maintenance was not properly followed which allowed a persistent, highly pathogenic strain of Legionella to be present in the potable water system.

107.    The CDC, reporting on the Epi-Aid investigation, noted that the VA Hospital had relied upon a Legionella threshold which was too high for preventing outbreaks.  The CDC also recorded that there was extensive construction going on at the facility which was not accounted for in the maintenance of the water system during the outbreak.

108.    The investigation concluded on November 16, 2012 when the last member of the field team left Pittsburgh, and initial recommendations were made to stop disease transmission to minimize patient exposure to critical water sources and for short-term systematic potable water system remediation.

109.    The CDC also recommended enhanced testing and surveillance for Legionella disease to identify any new cases in the Pittsburgh VA system.

110.    On November 16, 2012, VA spokesman Dave Cowgill, announced the Legionnaire's Disease outbreak and noted that the water treatment system meant to prevent Legionella bacteria "may not be as effective as previously thought, as is the case in other health systems using this method" to fight the Legionella bacteria.

## COUNT I

## SURVIVAL ACTION

111.    The foregoing paragraphs are incorporated by reference as fully as if they were set forth at length herein.

112.    Defendant United States of America was negligent in the following particulars:

a.    In failing to maintain its water system at the VA University Drive Hospital to allow the Legionella bacteria to grow to epidemic proportions;

b.    In failing to properly teach, instruct and monitor the employees of the VA University Drive Hospital in how to maintain the water system;

c.    In failing to have adequate management of the special water treatment system intended to keep the deadly Legionella bacteria from thriving;

d.    In failing to correct the problems and to understand the phrase "heat and flush" to eradicate the Legionella bacteria from the water system at the VA University Drive Hospital;

e.    In failing to hyper-chlorinate the water system during potential eradication of the Legionella bacteria from the water system at the VA University Drive Hospital;

f.    In failing to hire an appropriate facilities manager with the proper education and understanding of water facilities and water treatment system wherein the Legionella bacteria can thrive;

g.    In failing to test for Legionnaire's Disease in all patients believed to have contracted pneumonia while hospitalized as required by the 2008 guidelines issued by the Veterans Health Administration;

h.    In failing to perform molecular testing on sputum samples from all Legionella patients;

i.    In failing to communicate between facilities management and infection control to understand the Legionella outbreak and eradication efforts;

j.    In failing to monitor and test those patients in the hospital in September 2011 to determine whether or not they were either susceptible or had the Legionnaire's Disease before it became deadly;

k.    In failing to protect the patients in the VA Hospital when they were aware that Legionella was present in the water system;

l.      In reporting inaccurate ionized levels for Legionella control to persist, allowing Legionella to flourish in the water system;

m.      In failing to maintain the copper-silver ionization at the VA;

n.      In altering the test results from the monitoring of the copper-silver ionization system;

o.      In failing to have anyone from the facilities management team actively aware or belonging to the infection control team;

p.      In failing to test patients for Legionnaire's Disease when an active epidemic outbreak was known in the hospital system;

q.      In failing to test all outlets, and only selecting and testing certain outlets, to determine whether or not Legionella was present in the hospital;

r.      In failing to control the ion levels in the copper-silver ionization system which allowed Legionella to persist in the water system;

s.      In failing to bring in outside consultants and experts who had knowledge of Legionnaire's Disease;

t.      In failing to recognize the signs and symptoms of Legionnaire's Disease in Mr. Compston and perform sputum and urine antigen testing in a timely manner;

u.      In failing to properly communicate within the hospital concerning the Legionnaire's outbreak so that prophylactic testing and treatment could be performed on patients;

v.      In failing to recognize and act appropriately on the signs and symptoms that Mr. Compston showed before a Legionnaire's diagnosis;

w.      In allowing Mr. Compston to be exposed to Legionnaire's Disease in the VA Hospital;

x.      In allowing Mr. Compston to be exposed to Legionnaire's Disease in the VA Hospital when it was known that there was an epidemic in the VA Hospital;

y.    In failing to timely test Plaintiff's Decedent for a Legionella infection while knowing that an active outbreak of Legionella bacteria was occurring in its facility;

z.    In failing to timely diagnose Plaintiff's Decedent with the Legionella bacteria;

aa.    In failing to timely order and administer intravenous medication to treat Plaintiff Decedent's Legionella infection;

bb.    In failing to timely administer intravenous medication before definitive Legionella test results were available;

cc.    In failing to inform Plaintiff's Decedent and his family that Legionella bacteria had been discovered in the water purification system at the facility;

dd.    In failing to protect Plaintiff's Decedent from Legionella bacteria exposure;

ee.    In failing to promptly consult an Infectious Disease specialist and the CDC; and

ff.    In failing to appropriately treat Plaintiff Decedent by changing his prescribed antibiotics due to lack of supply.

113.    The negligence of the Defendant, as described herein, was the legal cause of the Plaintiff's injuries and damages as described herein.

114.    The negligence of the Defendant, as described herein, increased the risk that the Plaintiff's Decedent would suffer the injuries and damages as described herein.

115.    As a direct and proximate result of the negligence of the Defendant, as described herein, the Plaintiff's Decedent suffered and the Defendant is liable to the Plaintiff for the injuries and damages described in this Complaint.

116.    As a direct and proximate result of the negligence and/or carelessness of the Defendant, as described herein, Clark E. Compston suffered the following injuries and damages:

a.    Legionnaire's Disease;

b.    Need for extensive testing and medical procedures;

c.    Need for hospitalizations;

d.    Complications, infections, fevers, respiratory distress, and rapid atrial fibrillation;

e.    Physical pain and suffering;

f.    Death;

g.    Loss of enjoyment of life's pleasures;

h.    Decreased life expectancy;

i.    Mental anguish and emotional distress; and

j.    Embarrassment and humiliation.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against the Defendant in an appropriate amount and that the Plaintiff be awarded damages and fees, costs, and such other relief as this Honorable Court deems just and appropriate.

## COUNT II

## WRONGFUL DEATH

117.    The foregoing paragraphs are incorporated by reference as fully as if they were set forth at length herein.

118.    Plaintiff brings this Wrongful Death Action pursuant to the Pennsylvania Wrongful Death Act 42 Pa. C.S.A. §8301 *et seq.*

119.    The negligence of the Defendant, as described herein, caused the Plaintiff's injuries and damages as described herein.

120.    The negligence of the Defendant, as described at length herein, increased the risk that the Plaintiff would suffer the injuries and damages as described herein.

121.    As a direct and proximate result of the Defendant's negligence, as described herein, Plaintiff suffered and Defendant is liable for the within described damages and also the following:

    a.    Funeral expenses for the Decedent;

    b.    Expenses for administration related to Decedent's injuries;

    c.    Medical and hospital expenses;

    d.    Decedent's children have been denied and have forever lost the services, assistance, guidance, counsel, companionship and society of Clark E. Compston; and

    e.    Such other damages as are permissible in a wrongful death action.

WHEREFORE, the Plaintiff respectfully requests this Honorable Court enter judgment in his favor and against the Defendant in an appropriate amount and that the Plaintiff be awarded damages and fees, costs, and such other relief as this Honorable Court deems just and appropriate.

Respectfully submitted,

SHENDEROVICH, SHENDEROVICH
& FISHMAN, P.C.


By:     /s/ Craig L. Fishman, Esq.
         Craig L. Fishman, Esquire
         Attorney for Plaintiffs